BAP Appeal No. 20-55    Docket No. 54    Filed: 12/01/2021    Page: 1

**FILED**
U.S. Bankruptcy Appellate Panel
of the Tenth Circuit

**December 1, 2021**

**Blaine F. Bates**
**Clerk**

NOT FOR PUBLICATION[1]

# UNITED STATES BANKRUPTCY APPELLATE PANEL

## OF THE TENTH CIRCUIT

_____

| | |
|---|---|
| IN RE TARA D. STUM and JAY PATRICK STUM, | BAP No. CO-20-055 |
| | BAP No. CO-20-059 |
| Debtors. | |
| _____ | |
| MCCLAVE STATE BANK, | Bankr. No. 19-15996 |
| | Adv. No. 19-01344 |
| Plaintiff - Appellee - Cross-Appellant, | Chapter 7 |
| v. | |
| JAY PATRICK STUM, | OPINION |
| Defendant - Appellant - Cross-Appellee. | |

_____

Appeal from the United States Bankruptcy Court
for the District of Colorado
_____

Before **SOMERS**, **JACOBVITZ**, and **LOYD**, Bankruptcy Judges.
_____

**SOMERS**, Bankruptcy Judge.
_____

---

[1]This unpublished opinion may be cited for its persuasive value, but is not precedential, except under the doctrines of law of the case, claim preclusion, and issue preclusion. 10th Cir. BAP L.R. 8026-6.

Claims of nondischargeability under 11 U.S.C. § 523[2] are notoriously difficult to prove at trial; and once proved, they are equally difficult to disturb on appeal. They are highly fact-dependent, and require a bankruptcy court to sift through the testimony and proffered exhibits, make findings of fact, and then apply the law to the facts. In the Bankruptcy Court, McClave State Bank claimed the debtor Jay Stum is indebted to it pursuant to four promissory notes. McClave State Bank then filed a nondischargeability action based on misrepresentations and omissions in financial statements provided by Mr. Stum during the parties' lending relationship.

After a trial on the merits, the Bankruptcy Court concluded Mr. Stum materially misstated his liabilities and intended to deceive McClave State Bank by omitting debt in his financial statements. The Bankruptcy Court also concluded that McClave State Bank actually and reasonably relied on the false liability disclosures, and therefore concluded Mr. Stum's debts to McClave State Bank were nondischargeable under § 523(a)(2)(B). Mr. Stum challenges on appeal the Bankruptcy Court's conclusions that (1) McClave State Bank reasonably relied on Mr. Stum's financial statements and the omission of certain debt, and (2) Mr. Stum intended to deceive McClave State Bank when he provided the false financial statements. Because we find no fault in the Bankruptcy Court's factual findings under the highly deferential clear-error standard of review, we affirm the judgment of the Bankruptcy Court.

---

[2] All future references to "Code," "Chapter," "Section," and "§" are to the Bankruptcy Code, Title 11 of the United States Code, unless otherwise indicated.

2

## I.    Background

Mr. Stum owns 23% of the shares in Thunderbird Livestock and Land, Inc. (hereinafter "Thunderbird"). Thunderbird is a closely held family corporation. It is a large operation in the local community in McClave, Colorado—running a sizeable family farm, a grain storage business, a fuel distribution business, a parts store, and the only convenience store in the community. The Thunderbird stock is not publicly traded and is highly restricted in terms of marketability outside the Stum family.

Colby Mick is an agriculture lender with McClave State Bank. McClave State Bank is located in the same community as Thunderbird, in McClave, Colorado. Mr. Stum first approached McClave State Bank in early 2017 to refinance his loans from another bank, but he was denied a loan. Mr. Mick testified that Mr. Stum's debts were very high compared to his equity position at that initial inquiry, and McClave State Bank required him to reduce his debt and make his operation "more cash flowable"[3] in order to get a loan.

Mr. Stum then reduced some of his debt load and leased acres and again requested credit. Following its standard lending practice, McClave State Bank obtained a financial statement (dated January 2017), three years of tax returns, a credit report, and a cash flow statement from Mr. Stum, and met with Mr. Stum both in person and via telephone concerning his application.[4] Mr. Stum's financial statement reported a net worth of $4,534,792, which included 640 acres of farmland valued at $576,000. The January 2017

---

[3] *Transcript of Day 1 Trial* at 31, *in* Appellant's App. at 112.

[4] The same process detailed herein for the parties' first loan was repeated for each of the subsequent loans.

financial statement also reported 156 head of livestock, valued at $268,400, and equipment valued at $495,000.[5] Finally, the financial statement reported Mr. Stum owned 2273 shares of Thunderbird, with a $1614 value per share, yielding a total value of $3,668,622.[6] The financial statement reported total liabilities of $645,300, identifying a series of debts owed by Mr. Stum but not any debt owed by Mr. Stum to Thunderbird.

Mr. Mick compiled a risk rating for the loan request and then took the request to the Bank's loan committee for review. In Mr. Mick's assessment, Mr. Stum had downsized his operation, eliminated debt, and was current on outstanding loans but did not have a good credit score. Mr. Stum's prior three years' tax returns generally showed negative income. On a scale of 1 (good) to 7 (bad), Mr. Mick assigned Mr. Stum a risk rating of 1 for debt to worth ratio,[7] a risk rating of 6 for current ratio,[8] a risk rating of 7 for three-year average term debt coverage,[9] a risk rating of 2 for loan to collateral,[10] and a rating of 7 for credit history. Mr. Stum's average risk rating was 4.6, rounded to 5. McClave State Bank did not make loans if the overall risk rating exceeded a score of 5. Mr. Mick also assessed Mr.

---

[5] The values for land, livestock, and equipment were the subject of the Bankruptcy Court trial but are not the subject of appeal. We include them for context concerning the loans.

[6] Mr. Stum's 2014 tax return noted a sale of 40 shares of Thunderbird stock, at $900 per share, so McClave State Bank knew the value from three years prior had been less.

[7] The debt to worth ratio was computed by dividing total liabilities by net worth. A rating of 1 was very favorable and low risk to the Bank.

[8] The current ratio was computed by dividing current assets by current liabilities. A rating of 6 was unfavorable and high risk.

[9] A rating of 7 is very unfavorable and high risk, the worst rating on the Bank's scale.

[10] The loan to collateral rating indicated the amount of collateral to secure the loan, and a rating of 2 was favorable and low risk.

Stum's ability to repay, which he characterized as poor, and Mr. Stum's debt service coverage ratio, which also produced a red flag. Regarding Mr. Stum's proffered equipment collateral, Mr. Mick did not rely on Mr. Stum's valuation of $495,000, and instead assessed the market value as $354,100. Similarly, regarding the livestock collateral, Mr. Mick did not accept Mr. Stum's valuation of $268,400, and instead assessed the market value as $174,720.

The Thunderbird stock was mentioned only with respect to it providing the substantial portion of Mr. Stum's net worth. Mr. Mick testified that in making the loan to Mr. Stum, McClave State Bank relied heavily on the Thunderbird shares contributing to Mr. Stum's net worth, and without that component of his net worth, Mr. Stum would not have qualified for the loan. Mr. Mick testified that McClave State Bank knew the value of the Thunderbird shares needed to be discounted because the shares were restricted shares of a closely held corporation and the value of the shares reported on Mr. Stum's financial statements did not include that discount. Mr. Mick further testified that McClave State Bank knew Thunderbird was "worth millions," relying in part on the Bank's general familiarity with Thunderbird and its ownership. McClave State Bank did not review any stock certificates for Mr. Stum's shares in Thunderbird, did not ask for corporate documentation from Thunderbird, and did not request or review a balance sheet or other financial information from Thunderbird. Mr. Mick's justification for this was that McClave State Bank never made a loan against the shares of Thunderbird stock and was not providing a loan to Thunderbird.

5

McClave State Bank ultimately agreed to extend credit. On July 31, 2017, Mr. Stum executed a promissory note with McClave State Bank in the original principal amount of $256,453.44. McClave State Bank obtained a security agreement from Mr. Stum, securing its loans with Mr. Stum in farm machinery and products, livestock, crops, equipment, general intangibles, accounts, and accounts receivables. The loan was not secured by the Thunderbird shares.

About seven months later, on February 26, 2018, Mr. Stum executed a second promissory note with McClave State Bank in the original principal amount of $75,000. The same loan committee process was repeated as above, relying on the same documents. Mr. Mick noted in his assessment of the loan request that Mr. Stum had paid his first loan throughout the last year.

A March 2018 financial statement provided by Mr. Stum to McClave State Bank listed an increased net worth of $5,095,042, with the same real estate land value, but this time reported 474 head of livestock, valued at $438,650, and equipment valued at $646,348. The March 2018 financial statement again reported Mr. Stum owned 2273 shares of Thunderbird, with a $1614 value per share, yielding a total value of $3,668,622—the same as the January 2017 financial statement. The March 2018 financial statement reported total liabilities of $358,305, again identifying a series of debts owed by Mr. Stum that did not include any debt owed by Mr. Stum to Thunderbird.

About nine months after his second note, on November 13, 2018, Mr. Stum executed a third promissory note with McClave State Bank in the original principal amount of

6

$63,362.72. McClave State Bank additionally relied on the March 2018 financial statement when it entered this third note.

In January 2019, McClave State Bank considered a fourth loan for Mr. Stum. Again, an internal review was performed, but the loan to collateral category risk rating went from 2 to 4, a deterioration of the risk rating. Ultimately a loan was approved. On January 8, 2019, Mr. Stum executed a fourth promissory note with McClave State Bank in the original principal amount of $55,679.96.

All four notes were secured by Mr. Stum's inventory, accounts, general intangibles, equipment, farm products and livestock. Mr. Mick testified that McClave State Bank followed and relied on the 2017 financial statement, as least in part, when it made all four loans. In making the four loans, McClave State Bank relied on its standard lending practices. The Bankruptcy Court found that Mr. Stum never gave McClave State Bank any reason to distrust his veracity regarding the accuracy of the financial information in the financial statements or any reason to believe the information Mr. Stum disclosed to McClave State Bank was false or suspect.

Mr. Stum testified that his prior lenders requested financial statements in connection with his loan applications similar to what McClave State Bank requested, and neither of the prior lenders requested that he provide information to prove the value of his Thunderbird shares.

Shortly after the fourth loan, Mr. Stum and Mr. Mick discussed a potential additional loan, but this time secured by Mr. Stum's Thunderbird shares. Mr. Stum then submitted two additional financial documents—a balance sheet from Thunderbird dated as

of January 23, 2019, and a new personal financial statement dated February 28, 2019. Mr. Stum's loan request was not approved, and no additional loan was made. The Thunderbird balance sheet generally confirmed Mr. Stum's stock shares[11] but also revealed to McClave State Bank—for the first time—that Mr. Stum had a note payable to Thunderbird in the amount of $283,180.21. The debt owed by Mr. Stum to Thunderbird arose from a loan by Thunderbird to Mr. Stum prior to 2017. Pertinent here, the February 2019 financial statement then reported a far decreased net worth, but again did not disclose the debt owed by Mr. Stum to Thunderbird.

The testimony about Mr. Stum's debt to Thunderbird was, at best, not clear. The Bankruptcy Court characterized Mr. Stum's testimony about the debt as follows:

> During his examination he acknowledged that he was a borrower from Thunderbird. But then, after he acknowledged that he's a borrower and he owed money to Thunderbird during the testimony, then he turned around and denied that he owed $283,180 to Thunderbird.
> But then he was impeached with his own deposition testimony in which he clearly acknowledged that he owed Thunderbird $283,180, and that the amount was loaned to him by Thunderbird about 10 years ago.
> And later, still, during questioning by his counsel, the Debtor denied that he owed money to Thunderbird, and this was the reason. Quote, "Because it was a debt that was taken over by Thunderbird with some land, therefore when Thunderbird took over the land the debt went with it," end quote. That was the explanation.
> The Court finds that the Debtor's testimony is convoluted, confusing, contradictory, uncorroborated, and basically meaningless.[12]

---

[11] The January 2019 Thunderbird balance sheet reported Mr. Stum owned 2078 shares of Thunderbird, now valued at $1034 per share—much closer to the 2014 tax return figure for shares actually sold—yielding a total value of $2,148,282. The difference in the number of shares from prior reports—195—was explained by a note that the shares were in the process of being sold back to Thunderbird. That sale ultimately did not close.

[12] *Transcript of Telephonic Oral Ruling Following Trial* at 46-47, *in* Appellant's App. at 440-41.

Mr. Stum's father (Linly Stum) testified "yes and no" when asked if Mr. Stum owed the debt.[13] Ultimately, the Bankruptcy Court found, "based on the Thunderbird Financial Statement, and at least some testimony from Linly Stum, and the Debtor acknowledging the existence of the debt owed to Thunderbird, at least sometimes,"[14] that Mr. Stum owed $283,100 to Thunderbird at the time he submitted his financial statements to McClave State Bank but failed to disclose the debt.

The Bankruptcy Court found that Mr. Stum failed to disclose his guarantees of Thunderbird debt to Rabo-Agri Finance on his financial statements given to McClave State Bank. Mr. Stum executed two loan guarantees with that creditor on June 28, 2017, and on September 8, 2018 executed a third guarantee. The June 2017 guarantees were given only one month prior to Mr. Stum's first loan with McClave State Bank, and the September 2018 guarantee was given only two months prior to Mr. Stum entering his third loan with McClave State Bank.

About eight months after Mr. Stum entered his fourth loan with McClave State Bank, on August 14, 2019, Mr. Stum filed an individual chapter 12 bankruptcy petition. Mr. Stum's case was jointly administered with a case filed by his wife and then converted to chapter 7.[15] At filing, Mr. Stum reported on his Schedule B he had a 23% interest in

---

[13] *Transcript of Day 1 Trial* at 98, *in* Appellant's App. at 179.

[14] *Transcript of Telephonic Oral Ruling Following Trial* at 47, *in* Appellant's App. at 441. The conclusion Mr. Stum owes the debt to Thunderbird is not challenged on appeal.

[15] Mr. Stum defaulted on his repayment obligations, and McClave State Bank filed a state court civil action and a receiver was appointed in June 2019. Mr. Stum's spouse (Tara Stum) then filed a chapter 7 petition in July 2019. McClave State Bank very quickly sought relief from stay, and then Tara Stum filed a motion to convert her case to chapter 12. The day before the hearing on the motion for relief from stay in the Tara Stum case, on

Thunderbird, the interest was "subject to shareholder buyback provision,"[16] and the current value was zero. Mr. Stum also reported the debt to Thunderbird on his Schedules.

Through motions for relief from stay, McClave State Bank collected and liquidated some of its collateral. Additionally, McClave State Bank filed an adversary complaint objecting to the dischargeability of the debt owed by Mr. Stum under § 523(a)(2)(B) and § 523(a)(4).[17] Mr. Stum conceded he is indebted to McClave State Bank under the four promissory notes detailed above but contested nondischargeability. The Bankruptcy Court conducted a trial on the claims under § 523(a)(2)(B) and § 523(a)(4).

On the § 523(a)(2)(B) claim, the Bankruptcy Court concluded McClave State Bank proved Mr. Stum omitted his $283,180 debt to Thunderbird on his financial statements, inflating his net worth.[18] The Bankruptcy Court concluded a major reason McClave State

---

August 14, 2019, Mr. Stum filed his chapter 12 bankruptcy petition. About a month later, the Bankruptcy Court granted a motion to convert to chapter 12 in the Tara Stum case, and then both Stum cases were jointly administered from that point. McClave State Bank filed a motion for relief from stay to proceed against Mr. Stum, which was granted in November 2019. Shortly thereafter, in December 2019, both Stum cases were converted (or reconverted for Tara Stum) to chapter 7.

[16] *Stipulated Facts for Trial* at 3, *in* Appellant's App. at 65.

[17] Originally, McClave State Bank also objected to the entry of a discharge under § 727(a)(4) and (5) and objected to dischargeability under § 523(a)(2)(A), but it amended its complaint and proceeded to trial on only the claims under § 523(a)(2)(B) and § 523(a)(4).

[18] The Bankruptcy Court rejected McClave State Banks's additional alleged false statements by Mr. Stum. McClave State Bank argued five alleged false statements or omissions: (1) Mr. Stum's valuation of the Thunderbird stock, (2) Mr. Stum's valuation of his machinery and equipment, (3) Mr. Stum's valuation of his livestock, (4) Mr. Stum's valuation of his real property, and (5) Mr. Stum's omission of the debt to Thunderbird. The Bankruptcy Court found McClave State Bank failed to prove the asset values in the financial statements were materially false, so McClave State Bank's § 523(a)(2)(B) claim based on false asset valuations failed.

Bank approved each loan was because of its internal collateral valuation, but that the net worth computations and debt load were additional bases. The Bankruptcy Court then additionally found that Mr. Stum's omission was material; McClave State Bank actually relied on the financial statements in making each loan; it was reasonable for McClave State Bank to rely on those financial statements; and Mr. Stum's repeated omission of the debt was intentionally done, with intent to deceive. The Bankruptcy Court concluded McClave State Bank established the elements required to prove nondischargeability of its claim under § 523(a)(2)(B).

Regarding the claim under § 523(a)(4), the Bankruptcy Court concluded McClave State Bank did not carry its burden of proof. The Court entered judgment for McClave State Bank on its claim under § 523(a)(2)(B) and for Mr. Stum on the Bank's claim under § 523(a)(4), reserving the question of fees and costs.[19]

---

[19] *Judgment* at 1-2, *in* Appellant's App. at 383-84. After entry of judgment and the filing of Mr. Stum's notice of appeal, the parties filed a *Stipulated Motion to Correct Judgment*, suggesting the *Judgment* incorrectly stated the amount due and owing on Mr. Stum's debt to McClave State Bank. The Bankruptcy Court entered an *Order and Amended Stipulated Judgment Pursuant to Stipulation of the Parties*. Appellant's App. at 392-94. The total principal, interest, and late fees owed through October 1, 2020 was stipulated to be $288,320.06. Again, fees and costs were not included in the total. *Stipulated Motion to Correct Judgment* at 1-2, *in* Appellant's App. at 389-90; *Order and Amended Stipulated Judgment Pursuant to Stipulation of the Parties* at 2, *in* Appellant's App. at 393.

No party raised the issue of whether the Bankruptcy Court had authority to modify the *Judgment* when the *Stipulated Motion to Correct Judgment* was filed while the appeal was pending. *See* Fed. R. Civ. P. 60(a) (appellate court leave required to correct clerical mistakes, oversights, or omissions in judgment after appeal has been docketed and while appeal is pending); Fed. R. Bankr. P. 8008 (process for indicative rulings when a party files a motion in the bankruptcy court for relief that the court lacks authority to grant because of an appeal that has been docketed and is pending). Regardless, the amount of the judgment against Mr. Stum is not at issue in this appeal.

11

Mr. Stum appeals the judgment against him on the § 523(a)(2)(B) claim, challenging two factual findings by the Bankruptcy Court: (1) that McClave State Bank reasonably relied on his financial statements and the omission of the Thunderbird debt, and (2) that Mr. Stum intended to deceive McClave State Bank when he provided the false financial statements. McClave State Bank then filed a cross-appeal, preserving its right to argue the Bankruptcy Court erred in its factual finding that it had not proved Mr. Stum's valuation of his Thunderbird stock was a false statement. [20]

McClave State Bank did not appeal the entry of judgment against it on the claim under § 523(a)(4), and the Court will not, therefore, detail that claim further. In addition, because we conclude the Bankruptcy Court should be affirmed on its judgment for McClave State Bank on the claim under § 523(a)(2)(B) based on the omission of the Thunderbird debt from Mr. Stum's financial statements, we need not discuss the cross-appeal.

## II.    Jurisdiction and Standard of Review

"With the consent of the parties, this Court has jurisdiction to hear timely-filed appeals from 'final judgments, orders, and decrees' of bankruptcy courts within the Tenth Circuit."[21] A bankruptcy court's order resolving all claims asserted in an adversary

---

[20] Regarding the ultimate value to be assigned to the Thunderbird stock, the Bankruptcy Court concluded only that the value was not zero at the time Mr. Stum provided his financial statements, as alleged by McClave State Bank.

[21] *Straight v. Wyo. Dep't of Transp. (In re Straight)*, 248 B.R. 403, 409 (10th Cir. BAP 2000) (quoting 28 U.S.C. § 158(a)(1), (b)(1), and (c)(1)).

proceeding is a final order for purposes of 28 U.S.C. § 158.[22] Mr. Stum timely filed a notice

of appeal from the Bankruptcy Court's judgment.[23] No party elected for this appeal to be

heard by the United States District Court pursuant to 28 U.S.C. § 158(c). Accordingly, this

Court has jurisdiction over this appeal.

The ultimate determination of whether a debt is nondischargeable pursuant to § 523

is a legal question reviewed de novo.[24] However, this appeal involves the sufficiency of

the evidence at the Bankruptcy Court, or determinations of intent, and those findings are

reviewed under a clear-error standard.[25] Under the clear-error standard, this Court defers

to facts found by the Bankruptcy Court, unless those factual findings are "without factual

support in the record" or, "after examining all the evidence, we are left with a 'definite and

firm conviction that a mistake has been made.'"[26] In addition, if the Bankruptcy Court's

---

[22] *Adelman v. Fourth Nat'l Bank & Tr. Co, N.A., of Tulsa (In re Durability, Inc.)*, 893 F.2d 264, 266 (10th Cir. 1990) (concluding that a bankruptcy court order resolving an adversary proceeding is a final order).

[23] As noted above, the question of fees and costs was reserved, but "[w]hether the claim for attorney's fees is based on a statute, a contract, or both, the pendency of a ruling on an award for fees and costs does not prevent, as a general rule, the merits judgment from becoming final for purposes of appeal." *Ray Haluch Gravel Co. v. Cent. Pension Fund of Int'l Union of Operating Eng'rs & Participating Emps.*, 571 U.S. 177, 179 (2014).

[24] *United States v. Victor*, 121 F.3d 1383, 1386 (10th Cir. 1991) (citing *In re Grynberg*, 986 F.2d 367, 369 (10th Cir. 1993)) (interpreting § 523(a)(1)(A)).

[25] *DSC Nat'l Properties, LLC v. Johnson (In re Johnson)*, 477 B.R. 156, 168 (10th Cir. BAP 2012) (The bankruptcy court's findings of fact, including findings regarding intent, are reviewed for clear error.).

[26] *In re Johnson*, 477 B.R. at 168 (quoting *Cobra Well Testers, LLC v. Carlson (In re Carlson)*, No. 06-8158, 2008 WL 8677441, at *2 (10th Cir. Jan. 23, 2008) (unpublished)).

factual findings are premised on "improper legal standards or on proper ones improperly applied," those findings are not entitled to clearly-erroneous review.[27]

### III. Analysis

### A. Standards of Law Governing § 523(a)(2)(B)

Section 523(a)(2)(B) states:

(a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt– –

　　. . .

　　(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by– –

　　　　(B) use of a statement in writing--

　　　　　　(i) that is materially false;

　　　　　　(ii) respecting the debtor's . . . financial condition;

　　　　　　(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

　　　　　　(iv) that the debtor caused to be made or published with intent to deceive[.]

Section 523 exceptions to discharge "are narrowly construed, and because of the fresh start objectives of bankruptcy, doubt as to the meaning and breadth of a statutory exception is to be resolved in the debtor's favor."[28] A creditor bears the burden of proving nondischargeability under § 523(a) by a preponderance of the evidence.[29]

---

[27] *Id.* (quoting *Sender v. Johnson (In re Hedged-Invs. Assocs., Inc.)*, 84 F.3d 1267, 1268 (10th Cir. 1996)).

[28] *Id.* (internal alterations and quotations omitted). The exception to discharge found in § 523(a)(2)(B) "is in keeping with the basic policy animating the Code of affording relief only to an honest but unfortunate debtor." *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752, 1758 (2018) (internal quotations omitted).

[29] *Grogan v. Garner*, 498 U.S. 279, 290–91 (1991).

As noted above, Mr. Stum does not challenge on appeal the Bankruptcy Court's findings that he owed the debt to McClave State Bank, that he made a materially false statement in writing to McClave State Bank by failing to disclose his debt to Thunderbird on his financial statements, or that the omission of the debt was respecting his financial condition. On appeal, Mr. Stum challenges only the findings that McClave State Bank reasonably relied on his financial statements with the omitted debt when it made the loans and that he intended to deceive McClave State Bank when he provided the financial statements.

## B.    Reasonable Reliance

The Supreme Court interprets § 523(a)(2)(B) as "requir[ing] not only reasonable reliance but also reliance itself."[30] The Bankruptcy Court found that McClave State Bank showed both actual reliance and that its reliance was reasonable.

Regarding actual reliance, in the Tenth Circuit, a creditor need not rely exclusively on a false financial statement; partial reliance is enough.[31] The fraudulent financial statement need only be "a substantial factor in the creditor's decision."[32] Even then, partial reliance on a false financial statement is adequate "even if the financial statement is not the most substantial factor."[33]

---

[30] *Field v. Mans*, 516 U.S. 59, 68 (1995).
[31] *First Nat'l Bank v. Cribbs (In re Cribbs)*, No. 05-6225, 2006 WL 1875366, at *3 (10th Cir. July 7, 2006) (unpublished); *Cent. Nat'l Bank & Tr.t Co. v. Liming (In re Liming)*, 797 F.2d 895, 897 (10th Cir. 1986) (under § 523(a)(2)(B), a creditor need not "rely exclusively" on a false financial statement).
[32] *John Deere Co. v. Gerlach (In re Gerlach)*, 897 F.2d 1048, 1052 (10th Cir. 1990).
[33] *In re Cribbs*, 2006 WL 1875366, at *3.

15

The Bankruptcy Court found that McClave State Bank actually relied on Mr. Stum's January 2017 financial statement in making all of the loans, and that McClave State Bank additionally relied on the March 2018 financial statement to make the third and fourth loans.[34] The Bankruptcy Court found that Mr. Stum's liabilities played a "key part" in the approval process of the loans because McClave State Bank analyzed Mr. Sum's net worth, the debt to worth ratio, the average term debt coverage, and the debt service coverage ratio, and all of those depended on an accurate listing of liabilities. As Mr. Stum notes, McClave State Bank also relied on additional information, especially collateral values and its security coverage, but the Bankruptcy Court did not clearly err by finding the false liabilities were a substantial factor in McClave State Bank's lending decision. As the Tenth Circuit has noted, "[a] lender easily can rely on a financial statement *and* a security interest in making a loan."[35] The record adequately supports a finding that a higher debt load would have caused a less favorable analysis of Mr. Stum's loan applications; Mr. Mick testified McClave State Bank would not have made the loans had it known about the $283,100 debt to Thunderbird.[36] The record supports that testimony: An increased debt load was a concern of McClave State Bank, Mr. Stum was right at the limit of the bank's risk limit, and additional debt would have put Mr. Stum over that limit.

_____

[34] The Bankruptcy Court found that McClave State Bank did not rely on the February 2019 financial statement in making any loans because McClave State Bank received that financial statement after it had already made all of the loans.

[35] *In re Liming*, 797 F.2d at 898 (noting also, "Such reliance is justified; as the facts demonstrate here, 'excess' security can vanish rapidly").

[36] The Bankruptcy Court candidly noted Mr. Mick's testimony on this point was self-serving and convenient, but the Bankruptcy Court ultimately found Mr. Mick credible and credited his testimony.

The next question is the reasonableness of McClave State Bank's reliance.[37]

Reasonableness is an objective question,[38] and the line of reasonableness can be tricky to

place. The Tenth Circuit has stated:

> "The standard of reasonableness places a measure of responsibility upon a creditor to ensure that there exists some basis for relying upon debtor's representations. The reasonableness of a creditor's reliance will be evaluated according to the particular facts and circumstances present in a given case." In evaluating a creditor's reliance on a false financial statement, a court may not substitute its judgment for the business judgment of the creditor in deciding to make the loan. Further, the debtor's dishonesty will not excuse a creditor's unreasonable reliance on a false financial statement.[39]

The reasonableness evaluation is fact driven.[40] In making this inquiry, courts must consider

"the creditor's standard lending practices, the standard in the creditor's industry, and the

surrounding circumstances at the time the debtor applies for credit."[41] When looking at the

circumstances at the time the debtor applies for credit, courts must consider "whether there

are any 'red flags' in the application, whether there was an ongoing business relationship,

---

[37] Of course, "[w]hether the claimed partial reliance is actual, however, is not necessarily distinct from the reasonableness inquiry, as 'reasonableness goes to the probability of actual reliance.'" In re Cribbs, 2006 WL 1875366, at *3 (quoting Field, 516 U.S. at 76).

[38] Ins. Co. of N. Am. v. Cohn (In re Cohn), 54 F.3d 1108, 1117 (3d Cir. 1995) ("The reasonableness of a creditor's reliance under § 523(a)(2)(B) is judged by an objective standard, i.e., that degree of care which would be exercised by a reasonably cautious person in the same business transaction under similar circumstances.").

[39] Leadership Bank, N.A. v. Watson (In re Watson), 958 F.2d 977, 978 (10th Cir. 1992) (quoting First Bank v. Mullet (In re Mullet), 817 F.2d 677, 679 (10th Cir. 1987) (internal citations omitted), abrogated in part by Field v. Mans, 516 U.S. 59 (1995)).

[40] In re Mullet, 817 F.2d at 679 (The reasonableness of a creditor's reliance will be evaluated according to the particular facts and circumstances present in a given case.").

[41] In re Cribbs, 2006 WL 1875366, at *4.

and whether further investigation would have revealed inaccuracies in the debtor's application."[42]

Regarding the reasonableness of McClave State Bank's reliance, the Bankruptcy Court again appropriately weighed the evidence. Importantly, McClave State Bank relied on its standard lending practices. There were red flags—literally, Mr. Mick flagged in red areas of heightened concern. Mr. Stum had a poor credit score, a poor debt service coverage ratio, and a poor ability to repay. Mr. Stum was a poor overall risk rating and came in just at the minimum standards McClave State Bank would consider for entering a lending relationship. But, as the Bankruptcy Court noted, there was no evidence of any basis for the bank to question Mr. Stum's financial statements. There were no discrepancies, no inconsistencies, and no indication to McClave State Bank that Mr. Stum was lying or concealing his liabilities or other financial information.[43] Mr. Stum never gave McClave State Bank any reason to believe his financial statements were false, and the debt to Thunderbird was not a matter of public record.

---

[42] *Id.*

[43] *See, e.g.*, *In re Watson*, 958 F.2d at 980 ("[T]here was nothing in the financial statement which should have alerted the Bank that further investigation was necessary. The financial statement did not contain any inconsistent information nor did it contain any noticeable discrepancies which would have alerted the Bank that the financial statement might be inaccurate or incomplete."). Mr. Stum argues McClave State Bank was or should have been aware that he "was not sophisticated in matters of accounting" and some additional inquiry should have been made into his representations on his financial statements on that basis. Appellant's Br. at 13. But a debtor need not be an accountant to make simple disclosures about his debt load.

18

Importantly, the Bankruptcy Court did not substitute its business judgment for that of McClave State Bank.[44] The Bankruptcy Court concluded reasonableness was a close question. This Court agrees. With the benefit of hindsight now available to us, would we have asked for a balance sheet from Thunderbird in 2017, at the beginning of the parties' relationship, not in 2019 at the end? If the Bank's collateral to support loan approval had been Mr. Stum's Thunderbird shares, then it would have been reasonable to pursue the valuation of those shares more thoroughly. Such inquiry as to the shares' value may have uncovered the Thunderbird debt. But here, the issue is the Bank's reliance on Mr. Stum's debt load, and inquiry into Thunderbird would not reasonably have been part of that analysis. The Thunderbird shares were not collateral for the loans, and there was no indication of a debt to Thunderbird in any way. Thunderbird was a well-known family business in the community, and Mr. Mick knew the Thunderbird shares were a significant part of Mr. Stum's net worth. But McClave State Bank primarily looked to Mr. Stum's land, equipment, and livestock for collateral, and relied on Mr. Stum's net worth to determine his creditworthiness only in the face of his poor credit score. Under the facts and circumstances present here, we conclude the Bankruptcy Court did not clearly err in placing the line of reasonableness on the side of McClave State Bank.

---

[44] *In re Watson*, 958 F.2d at 978 ("a court may not substitute its judgment for the business judgment of the creditor in deciding to make the loan"); *see also Sec. Nat'l Bank & Tr. of Norman, Okla. v. Watson (In re Watson)*, 956 F.2d 279, (10th Cir. Feb. 18, 1992) (unpublished) ("The issue of reasonableness presented under § 523(a)(2)(B) is not whether it was reasonable for the Bank to have loaned Debtor $28,000, but whether it was reasonable for the Bank to have relied upon Debtor's financial statements in making that loan.").

## C.     Intent to Deceive

Section 523(a)(2)(B) requires that the debtor make the false statement at issue "with intent to deceive." The Tenth Circuit has characterized this as a "knowing" intent to deceive, but "the requisite intent may be inferred from a sufficiently reckless disregard of the accuracy of the facts."[45] In other words, "[i]t must be shown that the debtor's alleged false statement in writing was either knowingly false or made so recklessly as to warrant a finding that the debtor acted fraudulently."[46] Furthermore, intent to deceive is a "subjective inquiry" and can be "inferred from the totality of the circumstances."[47]

---

[45] *Driggs v. Black (In re Black)*, 787 F.2d 503, 506 (10th Cir. 1986), *abrogated in part on other grounds by Grogan v. Garner*, 498 U.S. 279 (1991). The Tenth Circuit perhaps softened this a couple of months after its statement in *In re Black* when it stated in *In re Liming*, 797 F.2d at 897, that "a statement need only be made with reckless disregard for the truth to make the underlying debt nondischargeable under § 523(a)(2)(B)." This Court has also stated: "Intent to deceive may be inferred from the totality of the circumstances, including a reckless disregard for the truth." *In re Cribbs*, 327 B.R. 668, 673 (10th Cir. BAP 2005), *aff'd*, 2006 WL 1875366. But we continue to believe "[a] finding of reckless disregard should be very narrowly interpreted because a misrepresentation is fraudulent only if the maker 'knows or believes the matter is not what he represents it to be.'" *Id.* (quoting *Chevy Chase Bank FSB v. Kukuk (In re Kukuk)*, 225 B.R. 778, 787 (10th Cir. BAP 1998)). Carelessness does not "rise to the level of reckless disregard for the truth or intent to deceive." *Blue Ridge Bank & Tr. Co. v. Cascio (In re Cascio)*, 342 B.R. 384, 2005 WL 4001131, at *3 (10th Cir. BAP Aug. 4, 2005) (unpublished).

[46] 4 *Collier on Bankruptcy* ¶ 523.08 (Richard Levin & Henry J. Sommer eds., 16th ed.).

[47] *In re Cribbs*, 327 B.R. at 673-74; *see also Carini v. Matera*, 592 F.2d 378, 380 (7th Cir. 1979) ("Indeed, where, as here, a person knowingly or recklessly makes a false representation which the person knows or should know, will induce another to make a loan, intent to deceive may logically be inferred."). Regarding "reckless disregard for the truth" supporting an intent to deceive under § 523(a)(2)(A), the Tenth Circuit BAP concluded: "Reckless disregard for the truth, therefore, is a subjective state of mind—the speaker makes the statement without caring whether the representation is true or false—which must be distinguished from failing to exercise the care and competence of a reasonable and prudent person before representing the fact as true." *DSC Nat'l Props., LLC v. Johnson (In re Johnson)*, 477 B.R. 156, 171 (10th Cir. BAP 2012).

The Bankruptcy Court concluded there was no direct evidence that Mr. Stum intended to deceive McClave State Bank with his financial statements. But there was evidence Mr. Stum knew he was required to accurately disclose his liabilities and knew or should have known his debt load was important to McClave State Bank. Mr. Stum had just been turned away from McClave State Bank because of his debt. The debt to Thunderbird was not insignificant in size in relation to the amounts borrowed and Mr. Stum's overall financial picture. The Bankruptcy Court also found it significant that Mr. Stum omitted not only his debt to Thunderbird, but also his guarantees to Rabo Agri-Finance. Those guarantees were given at almost the same time Mr. Stum was taking out loans with McClave State Bank. The evidence supports the Bankruptcy Court's conclusion Mr. Stum intentionally or with reckless disregard for the truth repeatedly withheld material information concerning his debt load, knowing McClave State Bank was concerned about his debt load.[48]

Mr. Stum argues the Bankruptcy Court erred by not accepting his proffered explanation for omitting the debt: that he believed the financial statements were accurate because "he believed the [Thunderbird] debt had been taken over by Thunderbird with some land and that when Thunderbird took over the land, the debt went with it."[49] Mr. Stum also points to the testimony from his father who, at best, equivocated on whether the

---

[48] *See Columbia State Bank, N.A. v. Daviscourt (In re Daviscourt)*, 353 B.R. 674, 685 (10th Cir. BAP 2006) (finding intent to deceive where the debtor "made numerous false representations and regularly held back material information").

[49] Appellant's Br. at 19 (citing *Transcript of Day 1 Trial* at 191-92, *in* Appellant's App. at 272-73).

debt existed. But an unsupported assertion of honest intent cannot overcome "'the natural inferences from admitted facts.'"[50] As noted in the factual recitation above, the testimony about the existence of the debt was "convoluted, confusing, contradictory, uncorroborated, and basically meaningless."[51] Mr. Stum asserts he had an honest intent, but the Bankruptcy Court weighed the evidence and found Mr. Stum knew he was required to accurately disclose his liabilities, conceded the information he provided was supposed to be true and accurate and that McClave State Bank would rely on it, was keenly aware of the importance of his debt load to the Bank, knew the "large and material debt" to Thunderbird existed, and also omitted other debts through his omission of his guarantees. All these findings are supported by the record and support the conclusion that Mr. Stum either intended to deceive McClave State Bank or acted with reckless disregard for the truth. The Bankruptcy Court weighed the totality of the evidence, the credibility of the witnesses, and came to the conclusion that Mr. Stum "offered no credible or cogent explanation for why the debt was omitted."[52] This Court defers to a bankruptcy court's opportunity "to judge the credibility of the witnesses."[53] The Bankruptcy Court observed the witnesses first-hand and is in the best position to determine each witness's credibility. The Bankruptcy Court did not clearly

---

[50] *Cent. Nat'l Bank & Tr. Co. v. Liming (In re Liming)*, 797 F.2d 895, 897 (10th Cir. 1986) (quoting 3 Collier on Bankruptcy ¶ 523.09[5][b], at 523-62 (15th ed.)).

[51] *Transcript of Telephonic Oral Ruling Following Trial* at 47, *in* Appellant's App. at 441.

[52] *Transcript of Telephonic Oral Ruling Following Trial* at 82, *in* Appellant's App. at 476.

[53] *Blue Ridge Bank & Tr. Co. v. Cascio (In re Cascio)*, 342 B.R. 384, 2005 WL 4001131, at *2 (10th Cir. BAP Aug. 4, 2005) (unpublished) (citing *Pierce v. Underwood*, 487 U.S. 552, 558 (1988)).

err in its conclusion Mr. Stum withheld information concerning the debt to Thunderbird with an intent to deceive.

## IV.    Conclusion

Given the "significantly deferential" clear error standard of review,[54] we affirm the decision of the Bankruptcy Court regarding McClave State Bank's § 523(a)(2)(B) claim based on the written false representation respecting Mr. Stum's financial condition. Because of this affirmance, McClave State Bank's cross-appeal is moot. The Bankruptcy Court's judgment is affirmed.

---

[54] *First Nat'l Bank v. Cribbs (In re Cribbs)*, 327 B.R. 668, 673 (10th Cir. BAP 2005) (noting the "significantly deferential" standard of review for bankruptcy court's factual findings concerning intent and reasonable reliance).